Thomas S. OWEN, Petitioner,

v.

Ken CLARK, Warden, Respondent.

Case No. CV 09–1909–CJC (OP).

United States District Court, C.D. California.

Oct. 5, 2010.

Tracy Dressner, Tracy J. Dressner Law Offices, La Crescenta, CA, for Petitioner.

Kim Aarons, Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

CORMAC J. CARNEY, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, and the Report and Recommendation of the United States Magistrate Judge, and the objections filed by Respondent and Petitioner, *de novo.* The Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge,

IT IS ORDERED that Judgment be entered:

(1) approving and adopting this Report and Recommendation; and

(2) directing that Judgment be entered granting a writ of habeas corpus in accordance with the findings of this Report and Recommendation as follows:

(a) The Board shall hold a parole suitability hearing to be held within thirty (30) days of the District Court's entry of Judgment on this decision;

(b) Petitioner shall be granted parole unless new, relevant and reliable evidence of his conduct in prison and/or change in mental state subsequent to the June 4, 2007, parole consideration hearing is introduced that is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole. Neither the Board, nor the Governor on review, if conducted, may rely on: the static factors of the commitment offense; Petitioner's 2003 or 1986 disciplinary actions; Petitioner's prior drug or alcohol use; Petitioner's 1978 misdemeanor conviction; or any other factor relied on by either the Board or the state court, as those factors did not constitute "some evidence" of Petitioner's current danger to public safety;

(c) In the absence of any such new, relevant and reliable evidence showing Petitioner's unsuitability for parole, the Board shall calculate at the hearing a prison term and release date for Petitioner in accordance with California law. If the calculated release date lapsed more than three years earlier, there shall be no term of parole imposed upon release; if the release date lapsed less than three years earlier, the release terms may include that period of

the three year parole term that remains.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

OSWALD PARADA, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

### I.

### *PROCEEDINGS*

On March 19, 2009, Thomas S. Owen ("Petitioner"), filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 with accompanying Memorandum of Points and Authorities and Exhibits ("Petition"). Petitioner challenges the Board of Parole Hearings' ("Board") June 15, 2007, decision finding him unsuitable for release on parole. On July 22, 2009, Respondent filed an Answer to the Petition. On August 18, 2009, Petitioner filed a Traverse to the Answer. Thus, this matter is ready for decision.

### II.

### *FACTUAL BACKGROUND*

**A. *Commitment Offense.***

The Board read the circumstances of the case into the record as they had been described in the probation officer's August 29, 1985, report:

"On May 15th, 1983 at about 8:45 p.m. victim Jean Singrin ... was awakened from sleep by the voice of her daughter, victim Lisa Singrin screaming 'Leave me alone. You get away from me.' Jean Singrin got up and ran down the hall. Momentarily she was stopped by codefendant Arthur Jacobs but she broke from his grasp and entered the den. There she saw defendant Thomas Owen hitting her daughter in the face with a 12–gauge shotgun. Jean Singrin tried to get between Owen and her daughter, Lisa Singrin. Jean Singrin was pushed down by the defendant. She was kicking at him when the defendant fired his weapon, blowing off the top of Lisa Singrin's head. Lisa's hair, scalp, bone, and brain matter were scattered throughout the room. She was pronounced dead at ... 8:57 p.m. Jean Singrin had a puncture wound on her right forearm and right hand. She was bruised from the waist to her shoulder and had powder marks on her arm. Accordingly, she had a bruise on the palm of her left hand and scratches ... and scrapes ... Witness told police that the victim Lisa Singrin had used marijuana, cocaine and speed and she was acquainted with both defendants. She had been seen with them at several bars. Further, the victim had gone to Jacobs' house on Colbrook ... to buy drugs and also to Owen's home on Marwick ... to buy drugs. Owen's home was ... well known as a place of drug sales and ... he was known as a drug dealer."

(Lodgment 2 at 11–13; *see also* Lodgment 1 (California Court of Appeal decision) for a more complete summary of the factual background.)

Petitioner has consistently denied participation in the crime. (Lodgment 9 at 5; Answer at 8.)

**B. *Trial and Sentencing.***

On August 5, 1985, Petitioner was convicted of second degree murder (Cal. Penal

Code § 187), and assault with a firearm (Cal. Penal Code § 245(a)(2)). (Lodgment 1 at 4.) The jury also found true that Petitioner had personally used a shotgun in the commission of the crime. (*Id.*) Petitioner was sentenced to a term of twenty-one years to life consisting of fifteen years for the second degree murder, two years for the firearm use enhancement, and four years for the assault. (*Id.*)

## C. *June 15, 2007, Parole Hearing.*

Petitioner has had a total of six parole consideration hearings. On June 15, 2007, the Board held his fifth subsequent parole consideration hearing, the one at issue herein. (Pet'r's Mem. P. & A. at 2.) At the time of the hearing, Petitioner had been incarcerated almost twenty-two years.

Denying Petitioner another hearing for a period of one year (Lodgment 2 at 89), the Board determined that Petitioner was unsuitable for parole for the following reasons:

> Of course, the crime itself was horrendous. A woman was beaten with a shotgun stock. She was shot by a shotgun—it removed a good portion of her head which included bone, scalp, part of her face. People invaded the home—in this case in the trial court both you and your codefendant and murdered in a way which was despicable in the fact that she was shot by a shotgun, as I've already noted. It was a brutal violent crime. As I noticed the crime involved the taking of a life of a 20–year–old female by the name of Lisa Singrin, ... which occurred around—on May 15th, 1983. In this case the inmate and the crime partner entered the residence of the Singrins. The victim's sister was here today and of course voiced her opposition to her—to your suitability. Although I must admit or maybe I don't recall specifically what she said last year or in this case I believe it was her mother—was it your mother that spoke last year? I believe it was. In this regard the mother of course, was very direct in accusing you for the crime but today I find a little different tone in the family. In this case we hear we—at least Mr. Armenta and I—believe we heard them say that they are looking for closure and, of course, the closure is your accepting responsibility for the crime. As you well know you did not have to do that nor are we asking you to do that. I'm just repeating what I heard from what they said today, and I just wanted to bring this out. As reported the victim was grabbed and accosted by you while she observed her daughter being beaten with the butt-stock of a shotgun. Her daughter as noted earlier was then shot and the shot caused tremendous damage and destruction to the victim and the victim's head. The victim's mother was then beaten viciously. Crime, of course, had multiple victims. One was killed in the same incident. The offense was carried out in an extremely callous disregard for human life and then—excuse me, for human suffering and then human life. As declared in the statement of fact it happened on May 15th 1983. The inmate and his crime partner entered the residence of the victim where she was ultimately beaten and murdered, and the mother in the statement of fact was also violently beaten. The inmate had a prior criminal—had prior criminality. Was arrested for possession of hashish or in this case I believe it was cannabis for which he was fined and that was back in 1979. He also admitted to the sale and use of narcotics for a period of time. However, there appears to be no other record of adult or juvenile history. Unstable social history in this regard—he had a long history of drug use. He started a

pattern—alcohol and drug use, as I noted, at an early age. He was 12 years old when he began drinking alcohol—he started using marijuana on a regular basis at 12—also at 12. Cocaine later on a regular basis. He stopped when he was around 26 years old. He tried LSD. He tried heroin. He tried meth and occasionally PCP. He found himself involved in drugs and the drug trade which finally ended up, we believe, to this horrendous crime. The question arises as to why they were in the house. We do know that the victim had a drug background. We believe there was a tie there. The prisoner has done extremely well since he's been in prison. He has been a model prisoner. He's programmed well while he's been incarcerated. He's developed three proven certificates of marketable skills. There's one Silk Screening that we don't believe we can find.

(Lodgment 2 at 79–86.)

The Board also found that Petitioner had upgraded himself both educationally and vocationally; had participated in self-help programs, including AA; had done well as far as disciplinary actions in prison with only one 128 counseling chrono,[1] in

April 1994 for misuse of a state phone; and had three serious 115 disciplinary reports, the last one being on May 27, 2003, for participating in a work strike.[2] (*Id.* at 83.) The other two 115s involved unauthorized use of a telephone in December 1986, and some unspecified conduct which could lead to violence in October 1986. (Lodgment 9 at 1.) They also commented that codefendants 2004 psychological report "has a little different take on one specific issue." (*Id.* at 83–84.) They then read that report's summary of the committing offense into the record.[3] (*Id.* at 84–85.) The Board also commented that although both Petitioner and his codefendant had denied knowing the victim or committing the offense,[4] they were identified by many witnesses at trial who had seen the victim and Petitioner and his codefendant at a local bar on several occasions and that the victim had purchased narcotics from Petitioner. (*Id.* at 85.)

The Board noted that the June 2005 psychological report by Dr. Bob Ohrling was "very, very supportive," but couched that by stating that "Mr. Ohrling, of course, is notorious for his positive comments on prisoners."[5] (Lodgment 2 at

---

**1.** "When ... minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono." *See* Cal. Code Regs. tit. 15, § 3312(a)(2). "When misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report." *See* Cal. Code Regs. tit. 15, § 3312(a)(3).

**2.** The Board members acknowledged that they were "familiar with that work strike," and although they considered it a "valid 115," they realized that approximately 700 prisoners were given that same 115. (Lodgment 2 at 83.)

**3.** That summary of the facts appears to be taken from the California Court of Appeal's

published decision on direct appeal in the case of *People v. Jacobs*, 195 Cal.App.3d 1636, 241 Cal.Rptr. 550 (1987). The Court fails to see how this report was in any way relevant to the Board's consideration of Petitioner's parole.

**4.** Petitioner reiterated to Dr. Ohrling that he did not do the crime, did not know the victim, did not know who did the crime, and was not there. (Lodgment 9 at 5.) Again, the information regarding witness testimony was apparently taken from the factual summary in *Jacobs*, 195 Cal.App.3d at 1642–46, 241 Cal. Rptr. 550, and/or the probation report.

**5.** The Court takes judicial notice of its June 25, 2007, Report and Recommendation in Petitioner's case number CV 06–5630–CJC (OP), which was issued pre-*Hayward v. Marshall*,

83.) The Board indicated that Petitioner's parole plans were "fine" and that he had viable residential plans, and multiple employment plans. (*Id.* at 86.) The Board commended Petitioner for completing three different vocations: graphic arts, electronics, and office-related technology, for continued long-term participation in AA and NA, and completion and involvement in "Life Skills, Beyond Anger, Six Phases of Anger, Forgiveness as a Gift, Arts in Corrections, Conflict Resolution ... Parenting class, Breaking Barriers,[and] Criminal and Addictive Thinking." (*Id.* at 88.) Dr. Ohrling's psychological report identified numerous other programs Petitioner had participated in while incarcerated, and included a lengthy discussion of Petitioner's prison work history and numerous laudatory chronos. (Lodgment 9 at 1–3.)

The Board denied parole for one year and recommended Petitioner remain discipline free, continue with his programming, and finish his junior college course. (Lodgment 2 at 89.)

At the end of the hearing, the following was reported:

> PRESIDING COMMISSIONER INGLEE: ... I wish I could give you a better—better information or better results but as I've said we have to work from what the—what the courts have told us—that the fact that you had committed the crime. Appellate Courts as I've already said before reaffirmed that. Your situation and the gravity of the crime is of such a nature that by itself is enough for us to turn you down.
>
> INMATE OWEN: For how long?

PRESIDING COMMISSIONER INGLEE: One year.

> INMATE OWEN: How long can you continue to do that?
>
> PRESIDING COMMISSIONER INGLEE: As far as I know, as long as a hearing council wishes to do so.

(Lodgment 2 at 90.)

### D. *The State Court's Decision.*

On July 1, 2008, the Los Angeles County Superior Court found that some evidence supported the Board's decision and denied Petitioner's habeas petition:

> The Court finds that there is some evidence to support that Board's finding multiple victims were attacked, injured, or killed in the same or separate incidents.... The 20–year old victim was brutally killed and her mother was severely beaten in the assault.
>
> The Court finds that the Petitioner had a previous criminal history, which involved a conviction for possession of hashish. The Court also finds that there is some evidence to support the Board's finding that the Petitioner had three 115s, including one in 2003, while in prison.
>
> In addition, the Board noted that the District Attorney's Office had opposed the Petitioner's release. While this is not a factor on which the Board may rely to deny parole, such opposition may be properly considered.
>
> As noted by the California Supreme Court, the commitment offense alone can constitute a sufficient basis for denial of parole, and the Board can weigh the amount of violence involved heavily

603 F.3d 546 (9th Cir.2010). In that Report and Recommendation, the Court noted that the Board at Petitioner's September 2, 2004, hearing noted that Petitioner's psychological reports had been supportive of release. The appeal of the Court's judgment in Petitioner's

prior habeas matter was stayed pending the Ninth Circuit's en banc decision in *Hayward.* The stay was lifted as of June 9, 2010. *See* PACER website, *Owen v. Vaughn*, Case No. 07–56747, Dkt. No. 29.

in making its decision. In this case, the Board properly considered the brutality of the commitment offense in making its determination.

The Board also noted several positive gains that the Petitioner has achieved while incarcerated. He has shown himself to be proficient in 12–step programs. He is nearly completed with work credits for a college degree. He has also had a generally positive record as a prisoner. In addition, his psychological report indicated that he was a low risk for future violence if released. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing.

(Lodgment 4 at 1–2 (citations omitted).)

## III.

### *PETITIONER'S CLAIMS*

Petitioner claims that the Board's decision violated due process because some evidence did not support the Board's denial, and was arbitrary and capricious, thereby violating his liberty interest in parole. (Pet'r's Mem. P. & A. at 2.)

## IV.

### *STANDARD OF REVIEW*

The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, a state court factual determination shall be presumed correct unless rebutted by clear and convincing evidence. *Id.* § 2254(e)(1).

■■■ Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson,* 217 F.3d 663, 669 n. 6 (9th Cir.2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir. 1999). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir.2004); *see also Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (in the absence of a Supreme Court

holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

▆▆▆ Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *Williams,* 529 U.S. at 405, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Packer,* 537 U.S. at 8, 123 S.Ct. 362.

▆▆▆ State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *Id.* at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (e.g., the rejected decision may state *Strickland*

rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti,* 537 U.S. at 27, 123 S.Ct. 357. An "unreasonable application" is different from an erroneous or incorrect one. *Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Visciotti,* 537 U.S. at 25, 123 S.Ct. 357.

## V.

### *DISCUSSION*

**A.** **The Current State of the Law on "Some Evidence".**

**1.** **Ninth Circuit and Federal Law.**

On April 22, 2010, the Ninth Circuit decided the case of *Hayward.* In relevant part, *Hayward* addressed (1) whether federal constitutional law imposes on the states a requirement for "some evidence" to support a state's denial of parole; and (2) whether, even if there is no general federal "some evidence" requirement, applicants for parole in California, under the state's current laws, may obtain federal habeas review of whether there was "some evidence" to support a parole denial. *Hayward,* 603 F.3d at 549.

With respect to the first issue, the Ninth Circuit held that *"in the absence of state law establishing otherwise,* there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else." *Id.* at 560 (emphasis added). The court specifically overruled the decisions in *Irons v. Carey,* 505 F.3d 846 (9th Cir.2007), *Sass v. California Bd. of Prison Terms,* 461 F.3d 1123 (9th Cir.2006), and *Biggs v. Terhune,* 334 F.3d 910, 915 (9th

Cir.2003), but only to the extent they "might be read to imply that there is a federal constitutional right [to release on parole] *regardless of whether* state law entitles the prisoner to release." *Id.* at 555 (emphasis added); *see also Pearson v. Muntz,* 606 F.3d 606, 610 n. 3 (9th Cir. 2010) (the holdings of *Biggs, Sass,* and *Irons* were not disturbed with regard to the federally protected liberty interest created by the state laws and rules governing California's parole system).

With respect to the second issue, the Ninth Circuit found that California law provides the right to parole unless "some evidence" of future dangerousness to the public exists. *Hayward,* 603 F.3d at 562–63. Therefore, because California law provides a liberty interest in parole under those circumstances, federal due process allows for federal habeas review of whether a California judicial decision denying parole was an " 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.' " *Id.* at 563 (citing 28 U.S.C. § 2254(d)(1) & (2)); *see also Pearson,* 606 F.3d at 608–09. If there was not "some evidence" of future dangerousness, parole must be granted.

In denying parole, the Board or Governor may rely solely on unchanging factors such as the circumstances or gravity of the commitment offense, and the prisoner's conduct prior to imprisonment. *See Irons,* 505 F.3d at 851–53; *Sass,* 461 F.3d at 1129; *Biggs,* 334 F.3d at 916; *Jancsek v. Or. Bd. of Parole,* 833 F.2d 1389, 1390–91 (9th Cir.1987). The Ninth Circuit has observed that reliance on such unchanging factors to deny parole might eventually constitute a violation of due process. *See Biggs,* 334 F.3d at 916–17; *see also Irons,* 505 F.3d at 853; *Sass,* 461 F.3d at 1129.

### 2. *California Law.*

Under *Irons,* the Court's analysis of whether the unsuitability determination is supported by "some evidence" is framed by the "statutes and regulations governing parole suitability" determinations in California. *See Irons,* 505 F.3d at 851. First, the Court must determine the findings "necessary to deem a prisoner unsuitable for parole." *Id.* Then, the Court must review the record to determine whether the state court's decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" standard. *Id.* However, "[t]o determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.' " *Sass,* 461 F.3d at 1128.

California law mandates that a parole release date be set unless the panel determines that "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration . . . ." Cal. Penal Code § 3041(b). The Board is charged with determining "whether the life prisoner is suitable for release on parole," and whether "the prisoner will pose an *unreasonable* risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a) (emphasis added). In determining suitability for parole, the panel is directed to consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. *Id.* § 2402(b)-(d).

The California Code of Regulations sets forth, as a guide, a non-exhaustive list of factors that are to be considered by the Board in evaluating parole suitability.

Factors that weigh against parole include that a prisoner: (1) carried out the offense in an especially heinous, atrocious, or cruel manner, e.g., the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, involved an attack on multiple victims, involved abuse or mutilation of the victim, or the motive for the crime was inexplicable or trivial in relation to the offense; (2) has a prior record of violence; (3) has an unstable social history; (4) has a lengthy history of severe mental problems related to the offense; or (5) has engaged in serious misconduct in prison. *Id.* § 2402(c).

Factors that weigh in favor of parole include that the prisoner: (1) has shown signs of remorse, including attempting to repair the damage, or indicating that he understands the nature and magnitude of the offense; (2) has no juvenile record; (3) has a stable social history; (4) is of an age that reduces the probability of recidivism; (5) committed the crime as a result of significant stress in his life; (6) has made realistic plans for release or has developed marketable skills that can be put to use upon release; or (7) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. *Id.* § 2402(d).

It has now been clarified under recent California law that the paramount task of the Board is to determine whether the prisoner would be an unreasonable danger to society if he or she were paroled:

> [A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." ... These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not

logically relate to anything but the threat *currently* posed by the inmate.

> . . . .

> [U]nder the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*In re Lawrence,* 44 Cal.4th 1181, 1202, 1205–06, 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008) (citations omitted) (abrogating prior California Supreme Court decisions in *In re Rosenkrantz,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002) and *In re Dannenberg,* 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005), to the extent that those decisions implied that a particularly egregious commitment offense always will provide the requisite modicum of evidence supporting the Governor's decision).

 The *In re Lawrence* court clarified that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense" and a parole decision is not "dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense." *Id.* at 1221, 82 Cal.Rptr.3d 169, 190 P.3d 535. "Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports

**1194**

the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings" supporting suitability or unsuitability for parole. *Id.* at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535; *see also In re Shaputis,* 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008) (companion case to *In re Lawrence* ); *Hayward,* 603 F.3d at 562 ("[A]s a matter of state law, 'some evidence' of future dangerousness is indeed a state *sine qua non* for denial of parole in California.") (citations omitted).

█ With respect to the Board's or Governor's reliance solely on the commitment offense to deny parole, the California Supreme Court also held:

> [T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*In re Lawrence,* 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535. The court went on to note that in the case where (1) an inmate's rehabilitation and suitability for parole is overwhelming, (2) the only evidence related to unsuitability is the gravity of the commitment offense, and (3) that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide some evidence that inevitably supports the ultimate decision that the inmate

remains a threat to public safety. *Id.* at 1191, 82 Cal.Rptr.3d 169, 190 P.3d 535. Under California law, therefore, "the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." *In re Shaputis,* 44 Cal.4th at 1254, 82 Cal.Rptr.3d 213, 190 P.3d 573.

█ Accordingly, the California Supreme Court has expressly rejected the notion that the mere existence of one or more unsuitability factors described in the State's regulations is itself necessarily sufficient to support the ultimate conclusion that the inmate currently poses an unreasonable risk of danger if released, which is the "focus" of and only relevant determination underpinning the parole decision. *In re Lawrence,* 44 Cal.4th at 1210, 82 Cal. Rptr.3d 169, 190 P.3d 535. As a matter of California law, therefore, the individualized consideration of the specified factors that is due an inmate "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." *Id.*

This Court is bound by the California Supreme Court's construction of its own laws. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005). Moreover, as noted above, the *Irons* decision itself explicitly instructs that the California statutes and regulations frame the application of the some evidence standard. Finally, the Ninth Circuit clearly instructs that this Court's task is to decide "whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence'

requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward,* 603 F.3d at 562–63 (citations omitted).

## B. *Analysis.*

As previously noted, the Board relied primarily on the commitment offense to find Petitioner unsuitable for parole. To some extent, it may also have relied on Petitioner's (1) prior criminal history, (2) unstable social history regarding drug use, and (3) three serious disciplinary 115 reports.

The superior court found that "some evidence" supported the Board's decision with respect to the commitment offense and with respect to the Board's finding regarding Petitioner's (1) prior criminal history; and (2) prison disciplinary record.

As instructed by the Ninth Circuit, the Court will address each of the reasons for denying parole to determine whether the state court decision rejecting parole was an "unreasonable application" of the California "some evidence" standard, or was "based on an unreasonable determination of the facts in light of the evidence." *Hayward,* 603 F.3d at 562–63.

### 1. *Prior Criminal History.*

[19] With respect to Petitioner's pre-incarceration history, the crime here constituted aberrant behavior and was not part of a pattern of continuing violent criminality. Petitioner's pre-incarceration record consisted only of a misdemeanor conviction for marijuana possession back in 1978 or 1979. (Lodgment 2 at 81; Lodgment 9 at 1.) Neither the Board nor the superior court articulated any nexus between this temporally distant misdemeanor conviction and Petitioner's current dangerousness.

Accordingly, the Court finds that Petitioner's prior criminal history fails to provide evidence of current dangerousness.

### 2. *Prison Disciplinary Record.*

■ Petitioner's post-incarceration record has been exemplary. He has not been cited for aggressive or violent behavior at any point during his incarceration. *See* Cal.Code Regs. tit. 15, § 2402(c)(6) (that the prisoner has engaged in serious misconduct in prison is an unsuitability factor). Between October and December 1986, shortly after incarceration, he received two 115s, one for unauthorized use of a telephone, and one for conduct "which could lead to violence." (Lodgment 9 at 1.) On May 27, 2003, he received one 115 for "participation in a work strike" (also a non-violent offense).[6] (*Id.* at 149.) Thus, at the time of the hearing in 2007, Petitioner had been virtually disciplinary free for over twenty-one years.

Accordingly, the Court finds that Petitioner's prison disciplinary record fails to provide evidence of current dangerousness.

### 3. *Unstable Social History.*

■ The Board commented that Petitioner had an unstable social history with regard to drug and alcohol use which he began using at the age of twelve. (Lodgment 2 at 81–82.) However, he stopped using drugs and alcohol twenty-six years

---

6. At Petitioner's fourth subsequent parole hearing, the Board expressly acknowledged that the 2003 rules violation for participation in the work strike was justified in that Petitioner's non-participation would have resulted in a violent confrontation. (*Owen v. Vaughn,* Case No. CV 06–5630–CJC (OP), Dkt. No. 17 (Report and Recommendation).) The Board at that time also expressly acknowledged that the other rules violations—both of which occurred in 1986—were very remote in time. (*Id.*)

ago, in 1983.[7] (*Id.* at 82; Lodgment 9 at 3.) As noted by Dr. Ohrling, there is no evidence of any drug or alcohol use since entering prison; Petitioner was involved with AA even prior to his arrest; and he has participated in AA and NA almost continuously while incarcerated, from 1989. (Lodgment 9 at 3.) Dr. Ohrling notes that "it is doubtful" that Petitioner would relapse into old patterns of behavior given the tools he has acquired to assist him in times of emotional or physical difficulty, his continuing involvement with AA/NA, and his more than twenty years of sober living. (*Id.* at 7.) Dr. Ohrling concluded that Petitioner's propensity for violence if released would be less than the average citizen. (*Id.*)

Accordingly, the Court finds that Petitioner's unstable social history fails to provide evidence of current dangerousness.

#### 4. *The Commitment Offense.*

 In reading the Board's decision, it is abundantly clear that it primarily relied upon the circumstances of the commitment offense in finding Petitioner unsuitable for parole. Indeed, the Board commented that the crime was brutal, violent, horrendous, despicable, that there were multiple victims, and that the crime was carried out with an "extremely callous disregard" for human suffering and life. (Lodgment 2 at 79–81.) The superior court agreed that the victim was "brutally killed" and that there were multiple victims.[8] (Lodgment 4 at 1.)

 The relevant inquiry when determining whether the commitment offense alone supports parole denial, howev-

er, "is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor." *In re Lawrence,* 44 Cal.4th at 1221, 82 Cal.Rptr.3d 169, 190 P.3d 535; *In re Dannenberg,* 34 Cal.4th at 1070–71, 23 Cal.Rptr.3d 417, 104 P.3d 783. As noted by the California Supreme Court, the aggravated nature of the crime itself does not provide some evidence of current dangerousness unless the record also establishes that something in Petitioner's pre- or post-incarceration history, or his current demeanor and mental state, indicates that the implications regarding his dangerousness that derive from his commission of the commitment offense remain probative to a determination of a continuing threat to public safety. *In re Lawrence,* 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535.

 There is no question that the circumstances of Petitioner's commitment offense are senseless, tragic, and warranted his incarceration. However, the murder occurred twenty-four years prior to the 2007 hearing, and after Petitioner had been incarcerated for more than twenty-one years. During those twenty-one years, as the Board itself acknowledged, Petitioner had been a "model" prisoner. (Lodgment 2 at 86.) For instance, he (1) upgraded educationally and vocationally in such areas as electronics, graphic arts, and office-related technology; (2) had participated in numerous self-help programs, in-

---

7. Petitioner is now fifty-two. (*See* Lodgment 9 at 1 indicating Petitioner's date of birth as November 21, 1958.)

8. Because the commitment offense standing alone cannot constitute the requisite evidence of current dangerousness, this Court need not

determine whether the Board's findings with regard to the circumstances of the commitment offense are supported by the record. *See Cooke v. Solis,* 606 F.3d 1206, 1215–16, 1216 n. 9 (9th Cir.2010).

cluding AA and NA and completed courses in "Life Skills, Beyond Anger, Six Phases of Anger, Forgiveness as a Gift, Arts in Corrections, Conflict Resolution ... Parenting class, Breaking Barriers,[and] Criminal and Addictive Thinking"; (3) had a "very, very" supportive 2005 psychological report; and (4) had parole plans that were "fine," with viable residential plans, and multiple employment plans. (*Id.*)

Accordingly, the circumstances of the commitment offense, committed in 1983, twenty-four years prior to the hearing, were not such that they continue to be predictive of Petitioner's current dangerousness this many years after commission of the offense, especially given the uncontested facts in the record demonstrating continued rehabilitation and exemplary behavior in prison. *See In re Lawrence*, 44 Cal.4th at 1217, 82 Cal.Rptr.3d 169, 190 P.3d 535. More significantly, the Board and superior court articulated no nexus whatsoever between those circumstances and Petitioner's current dangerousness.[9] In fact, the evidence was all to the contrary.

The Court finds Petitioner's case to be just the sort of case the Ninth Circuit envisioned in *Biggs, Sass,* and *Irons,* and that the California Supreme Court envisioned in *In re Lawrence:* where the commitment offense is relied on to deny parole notwithstanding the prisoner's positive behavior and evidence of rehabilitation since the commitment offense. Here, the Board relied on Petitioner's commitment offense alone as "some evidence" of unsuitability without proper consideration of the impact of more than twenty-one years of incarceration on the reliability of these factors in determining Petitioner's current dangerousness. (*Id.*) As one court has noted:

While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances—after nearly two decades of incarceration and half a dozen parole suitability hearings—violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.

*Rosenkrantz v. Marshall,* 444 F.Supp.2d 1063, 1084 (C.D.Cal.2006); *see also In re Burdan,* 169 Cal.App.4th 18, 29, 86 Cal. Rptr.3d 549 (2008).

Because the factors relied on by the Board, outside of the commitment offense, were wholly unsupported by the record, the commitment offense cannot, standing alone, constitute the requisite evidence of current dangerousness. *Cooke,* 606 F.3d at 1216. As stated by the Ninth Circuit in *Cooke:*

[Ea]ch of the Board's findings (other than those regarding the circumstances of the commitment offense) lacked any evidentiary basis. Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole. The Parole Board's findings were individually and *in toto* unreasonable because they were without evidentiary support. When habeas courts review the "some evidence"

---

9. This is also made clear by the Board's comment to Petitioner that the Board could keep denying parole based on the commitment of-

fense alone for as long as they wished to do so. (Lodgment 2 at 90.)

requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings. Here, there was no evidence that reasonably supports either the necessary subsidiary findings or the ultimate "some evidence" finding. Accordingly, we hold that the state court decision was " 'based on an unreasonable determination of the facts in light of the evidence.' " *Hayward*, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2)).

*Id.* (footnote omitted).

This Court reaches the same conclusion in this case for the very same reasons.

## VI.

### *RECOMMENDATION*

IT THEREFORE IS RECOMMENDED that the District Court issue an Order:

(1) approving and adopting this Report and Recommendation; and

(2) directing that Judgment be entered granting a writ of habeas corpus in accordance with the findings of this Report and Recommendation as follows: [10]

(a) The Board shall hold a parole suitability hearing to be held within thirty (30) days of the District Court's entry of Judgment on this decision;

(b) Petitioner shall be granted parole unless new, relevant and reliable evidence of his conduct in prison and/or change in mental state subsequent to the June 4, 2007, parole consideration hearing is introduced that is sufficient to support a finding that he currently poses an un-

10. *See, e.g., Milot v. Haws*, 628 F.Supp.2d 1152, 1157 n. 3 (C.D.Cal.2009) (noting that "the futility of remanding a parole case for 're-review' when the habeas court already has reviewed the evidence and found it insufficient to sustain an unsuitability finding has not escaped the state or federal courts" and citing cases). *See also In re Rico*, 171 Cal. App.4th 659, 89 Cal.Rptr.3d 866 (2009) (directing Board to conduct a new parole suitability hearing within thirty days and to find petitioner suitable for parole "unless either previously undiscovered evidence or new evidence subsequent to the 2007 parole hearing, regarding his conduct, circumstances, or change in his mental state, supports a determination that he currently poses an unreasonable risk of danger to society if released on parole"); *In re Gaul*, 170 Cal.App.4th 20, 87 Cal.Rptr.3d 736 (2009) (directing Board to hold new hearing within 30 days of finality of decision and to find inmate suitable for parole unless new evidence of conduct or change in mental state after 2007 parole consideration hearing is introduced and is sufficient to support a finding of current dangerousness); *In re Singler*, 169 Cal.App.4th 1227, 1230, 87 Cal.Rptr.3d 319 (2008) (where, as here, petitioner had never before been found suitable, court remanded for further proceedings to hear any motions relevant to defendant's plea and, if appropriate, hold a new sentencing hearing); *see also In re Vasquez*, 170 Cal. App.4th 370, 387, 87 Cal.Rptr.3d 853 (2009) (reversing Governor's decision overturning Board's parole grant and reinstating Board's parole release order); *In re Aguilar*, 168 Cal. App.4th 1479, 1491, 86 Cal.Rptr.3d 498 (2008) (reversing Governor's decision overturning parole grant, reinstating Board's parole release date, and ordering inmate released forthwith pursuant to conditions set forth in Board's 2005 decision finding inmate suitable for parole); *See also Guardado v. Perez*, No. C 05–00194 CW, 2009 WL 160622 (N.D.Cal. Jan. 22, 2009). The California Supreme Court has recently granted review in *In re Prather*, No. B211805, 2009 WL 1124976 (Cal.Ct.App. Apr. 28, 2009) (ordering a new parole hearing to determine if new and different subsequent evidence warrants a finding of current danger) and *In re Molina*, No. CR13298, 2009 WL 1026596 (Cal.Super.Ct. Apr. 16, 2009) (ordering immediate release) to determine appropriate remedies when a reviewing court finds the Board of Parole Hearings abused its discretion in denying parole. *See also Guardado v. Perez*, No. C 05–00194 CW, 2009 WL 160622 (N.D.Cal. Jan. 22, 2009).

reasonable risk of danger to society if released on parole. Neither the Board, nor the Governor on review, if conducted, may rely on: the static factors of the commitment offense; Petitioner's 2003 or 1986 disciplinary actions; Petitioner's prior drug or alcohol use; Petitioner's 1978 misdemeanor conviction; or any other factor relied on by either the Board or the state court, as those factors did not constitute "some evidence" of Petitioner's current danger to public safety;

(c) In the absence of any such new, relevant and reliable evidence showing Petitioner's unsuitability for parole, the Board shall calculate at the hearing a prison term and release date for Petitioner in accordance with California law. If the calculated release date lapsed more than three years earlier, there shall be no term of parole imposed upon release; if the release date lapsed less than three years earlier, the release terms may include that period of the three year parole term that remains.[11]

DATED: June 25, 2010

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, and the Report and Recommendation of the United States Magistrate Judge, *de novo*. The Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge,

IT IS ORDERED that Judgment be entered:

(1) approving and adopting this Report and Recommendation; and

(2) directing that Judgment be entered granting a writ of habeas corpus in accordance with the findings of this Report and Recommendation as follows:

(a) The Board shall hold a parole suitability hearing to be held within thirty (30) days of the District Court's entry of Judgment on this decision;

(b) Petitioner shall be granted parole unless new, relevant and reliable evidence of his conduct in prison and/or change in mental state subsequent to the June 4, 2007, parole consideration hearing is introduced that is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole. Neither the Board, nor the Governor on review, if conducted, may rely on: the static factors of the commitment offense; Petitioner's 2003 or 1986 disciplinary actions; Petitioner's prior drug or alcohol use; Petitioner's 1978 misdemeanor conviction; or any other factor relied on by either the Board or the state court, as those factors did not constitute "some evidence" of Petitioner's current danger to public safety;

11. *See McQuillion v. Duncan,* 306 F.3d 895, 901–02 (9th Cir.2002) (if inmate not immediately released, his sentence would have been lengthened by ordering him to serve a parole term where he had already served more time in prison than his "lawful period of imprisonment and parole combined"); *Tripp v. Cate,* No. C 07–05748 CW, 2009 WL 248368, at *12 (N.D.Cal. Feb. 2, 2009) (ordering Department of Corrections to calculate parole term based on 2004 suitability finding notwithstanding the fact that inmate was released in 2008).

(c) In the absence of any such new, relevant and reliable evidence showing Petitioner's unsuitability for parole, the Board shall calculate at the hearing a prison term and release date for Petitioner in accordance with California law. If the calculated release date lapsed more than three years earlier, there shall be no term of parole imposed upon release; if the release date lapsed less than three years earlier, the release terms may include that period of the three year parole term that remains.

### JUDGMENT

Pursuant to the Order Adopting Findings, Conclusions, and Recommendations of the United States Magistrate Judge,

IT IS ADJUDGED that the Petition is granted.